IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MELISSA B.,[1]

               Plaintiff,

      v.

ANDREW M. SAUL, Commissioner of Social
Security,

            Defendant.

Case No. 1:19-cv-00363-SB

**OPINION AND ORDER**

**BECKERMAN, U.S. Magistrate Judge.**

Melissa B. ("Plaintiff") brings this appeal challenging the Commissioner of Social

Security's ("Commissioner") denial of her applications for Disability Insurance Benefits and

Supplemental Security Income under Titles II and XVI of the Social Security Act. The Court has

jurisdiction to hear this appeal pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons

explained below, the Court reverses the Commissioner's decision and remands for an award of

benefits.

---

[1] In the interest of privacy, this opinion uses only the first name and the initial of the last
name of the non-governmental party in this case. Where applicable, this opinion uses the same
designation for a non-governmental party's immediate family member.

PAGE 1 – OPINION AND ORDER

**STANDARD OF REVIEW**

The district court may set aside a denial of benefits only if the Commissioner's findings are "'not supported by substantial evidence or based on legal error.'" *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)). Substantial evidence is defined as "'more than a mere scintilla [of evidence] but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

The district court "cannot affirm the Commissioner's decision 'simply by isolating a specific quantum of supporting evidence.'" *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999)). Instead, the district court must consider the entire record, weighing the evidence that both supports and detracts from the Commissioner's conclusions. *Id.* Where the record as a whole can support either the grant or denial of Social Security benefits, the district court "'may not substitute [its] judgment for the [Commissioner's].'" *Bray*, 554 F.3d at 1222 (quoting *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

**BACKGROUND**

**I.    PLAINTIFF'S APPLICATIONS**

Plaintiff was born in August 1962, making her fifty years old on June 1, 2013, the alleged disability onset date. (Tr. 66, 92.) Plaintiff completed three years of college coursework and has past relevant work experience as an administrative clerk. (Tr. 29, 256.) In her applications, Plaintiff alleges disability due to, among other things, neuropathy, fibromyalgia, depression, arthritis, high blood pressure, tremors, memory issues, a sleep disorder, and chronic pain. (Tr. 66-67.)

The Commissioner denied Plaintiff's application initially and upon reconsideration, and on December 1, 2015, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 15.) Plaintiff and a vocational expert ("VE") appeared and testified at a hearing held on November 20, 2017. (Tr. 40-63.) On January 30, 2018, the ALJ issued a written decision denying Plaintiff's applications. (Tr. 15-32.) On January 4, 2019, the Appeals Council denied Plaintiff's request for review, making the ALJ's written decision the final decision of the Commissioner. (Tr. 1-8.) Plaintiff now seeks judicial review of the ALJ's decision. (Compl. at 1-5.)

## II.    THE SEQUENTIAL PROCESS

A claimant is considered disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). "Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 724 (9th Cir. 2011). Those five steps are: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals a listed impairment; (4) whether the claimant can return to any past relevant work; and (5) whether the claimant can perform other work that exists in significant numbers in the national economy. *Id.* at 724-25.

The claimant bears the burden of proof for the first four steps. *Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001). If the claimant fails to meet the burden at any of those steps, the claimant is not disabled. *Id.* at 954 The Commissioner bears the burden of proof at step five of the analysis, where the Commissioner must show the claimant can perform other work

that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Tackett*, 180 F.3d at 1100. If the Commissioner fails to meet this burden, the claimant is disabled. *Bustamante*, 262 F.3d at 954.

## III.    THE ALJ'S DECISION

The ALJ applied the five-step sequential evaluation process to determine if Plaintiff is disabled. (Tr. 15-32.) At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since June 1, 2013, the alleged disability onset date. (Tr. 17.) At step two, the ALJ determined that Plaintiff suffered from the following severe impairments: "[F]ibromylagia; obesity; degenerative disc disease of the lumbar and cervical spine; neuropathy; and depressive disorder." (Tr. 18.) At step three, the ALJ concluded that Plaintiff did not have an impairment that meets or equals a listed impairment. (Tr. 19.) The ALJ then concluded that Plaintiff had the residual functional capacity ("RFC") to perform light work, subject to these limitations: (1) Plaintiff can lift and carry twenty pounds occasionally and ten pounds frequently; (2) Plaintiff can push and pull in accordance with her lifting and carrying limitations; (3) Plaintiff can sit, stand, and walk for six hours during an eight-hour workday; (4) Plaintiff can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs, but never climb ladders, ropes, or scaffolds; (5) Plaintiff cannot work at unprotected heights or around moving mechanical parts; and (6) Plaintiff needs to be limited to simple, routine tasks and simple work-related decisions. (Tr. 22.) At step four, the ALJ concluded that Plaintiff could not perform her past relevant work as an administrative clerk. (Tr. 29.) At step five, the ALJ concluded that Plaintiff was not disabled before August 10, 2017 (i.e., the date Plaintiff's age category changed to an individual of advanced age, and she became disabled "by direct application of Medical-Vocational Rule 202.06") because a significant number of jobs existed in the national economy

that she could perform, including work as a marketing clerk, router, and counter attendant. (Tr. 30-31.)

## DISCUSSION

In this appeal, Plaintiff argues that the ALJ erred by failing to provide: (1) specific and legitimate reasons for discounting the opinions of Plaintiff's treating neurologist, Walter Carlini, M.D. ("Dr. Carlini"), and examining psychologist, Claudia Lake, Psy.D. ("Dr. Lake"); and (2) specific, clear, and convincing reasons for discounting Plaintiff's symptom testimony. (Pl.'s Opening Br. at 5-6, 16.) As explained below, the Court concludes that the Commissioner's decision is based on harmful legal error and not supported by substantial evidence. The Court also concludes that Plaintiff satisfies the credit-as-true standard, and therefore remands for an award of benefits.

## I.    MEDICAL OPINION EVIDENCE

### A.    Applicable Law

"There are three types of medical opinions in social security cases: those from treating physicians, examining physicians, and non-examining physicians." *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009) (citing *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)). "Where a treating or examining physician's opinion is contradicted by another doctor, the '[ALJ] must determine credibility and resolve the conflict.'" *Id.* (quoting *Thomas v. Barnhart*, 278 F.3d 947, 956-57 (9th Cir. 2002)). "An ALJ may only reject a treating physician's contradicted opinions by providing 'specific and legitimate reasons that are supported by substantial evidence.'" *Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014) (quoting *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008)).

"An ALJ can satisfy the 'substantial evidence' requirement by 'setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation

thereof, and making findings.'" *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)). Merely stating conclusions is insufficient: "'The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct.'" *Id.* (quoting *Reddick*, 157 F.3d at 725). "[A]n ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion." *Id.* at 1012-13 (citing *Nguyen v. Chater*, 100 F.3d 1462, 1464 (9th Cir. 1996)).

**B.    Analysis**

Plaintiff argues that the ALJ failed to provide specific and legitimate reasons for discounting the opinions of her treating neurologist, Dr. Carlini, and examining psychologist, Dr. Lake.

**1.    Dr. Carlini**

Dr. Carlini completed a medical source statement on December 6, 2017. (Tr. 1165-69.) Dr. Carlini reported that (1) he has treated Plaintiff for more than four years, (2) his diagnoses include a benign essential tremor, migraine headaches, and demyelinating polyneuropathy,[2] (3) Plaintiff's signs and symptoms include tremors, headaches, gait disturbance and instability due to polyneuropathy, poor balance, and an "[a]bnormal" electromyogram ("EMG") and nerve conduction study ("NCS"), and (4) Plaintiff's medications cause dizziness and fatigue. (Tr. 1165-66.) Dr. Carlini opined that Plaintiff can stand and walk for no more than two hours during an eight-hour workday, Plaintiff would need sixty minutes' worth of unscheduled breaks

---

[2] "A demyelinating disease is any condition that results in damage to the protective covering (myelin sheath) that surrounds nerve fibers in your brain and spinal cord." *Parker v. Colvin*, 660 F. App'x 478, 480 n.4 (7th Cir. 2016).

during an eight-hour workday, Plaintiff can use her hands, fingers, and arms for no more than ten percent of the time during an eight-hour workday, and Plaintiff would miss more than four days of work per month due to her medical problems. (Tr. 1166-69.) Additionally, Dr. Carlini stated that the limitations he identified have been present since he began treating Plaintiff in June 2013. (Tr. 1169.)

The ALJ assigned "little weight" to Dr. Carlini's opinion (*see* Tr. 27), but failed to provide specific and legitimate reasons for doing so. As demonstrated below, the ALJ highlighted the record evidence that supports his decision to discount Dr. Carlini's opinion and overlooked significant, probative evidence that contradicted his findings. *See generally Holohan*, 246 F.3d at 1201 (stating that the district court cannot affirm the Commissioner's decision simply by isolating a specific quantum of supporting evidence); *Adeena W. v. Saul*, No. 6:19-cv-00051-SB, 2020 WL 2992191, at *5 (D. Or. June 4, 2020) (explaining that ALJs cannot "cherry-pick" from the record to support their findings while ignoring evidence that contradicts their findings).

For example, the ALJ concluded that Dr. Carlini's opinion was "render[ed] less persuasive" by the fact that he issued it "some months after the claimant's established onset date." (Tr. 27.) Dr. Carlini, however, stated that the limitations he identified have been present since he began treating Plaintiff on June 18, 2013, the day Plaintiff's provider referred her to Dr. Carlini, less than three weeks after the alleged disability onset date and more than four years before the established onset date. (*See* Tr. 15, 734, 1065, 1069.) The record also reflects that Dr. Carlini obtained test results (e.g., an EMG and NCS) before issuing his opinion. (*See* Tr. 1033, Dr. Carlini referred Plaintiff for "EMG/NCS" in August 2015.) Thus, the ALJ erred in discounting Dr. Carlini's opinion on the ground that it was issued "some months" after Plaintiff's

established onset date, as Dr. Carlini had direct knowledge of Plaintiff's historical condition and made clear that his opinions and findings pertained to the relevant time period. *See DeBerry v. Comm'r Soc. Sec. Admin.*, 352 F. App'x 173, 176-77 (9th Cir. 2009) (explaining that a treating physician's opinion is not entitled to "enhanced deference" if he merely offered "a retrospective opinion, with no personal knowledge of the claimant's historical condition"); *cf. Lee v. Berryhill*, 721 F. App'x 604, 607 (9th Cir. 2017) (holding that the ALJ did not err in discounting a treating physician's opinion who "wrote an initial letter expressing her opinion that [the claimant] was permanently disabled after a single appointment that included minimal objective medical testing" and a "second letter reaching the same conclusion" barely "three weeks into the patient-physician relationship and after only the second appointment").

The ALJ also discounted Dr. Carlini's opinion because he did not "review the longitud[in]al record," consider Plaintiff's mental health (including the report that Plaintiff's "mental health was magnifying her physical health symptoms"), or know about Plaintiff's "history of overdramatized pain behavior." (Tr. 27, citing Tr. 311, 413). These are not specific and legitimate reasons, supported by substantial evidence, for discounting Dr. Carlini's opinion.

Contrary to the ALJ's findings, Dr. Carlini was aware that Plaintiff was taking mental health medication, assessed Plaintiff's mental status, and reviewed medical evidence from throughout the period at issue, including (1) an August 2014 magnetic resonance imaging ("MRI") of Plaintiff's head, (2) videonystagmography ("VNG") test results from October 2014, (3) a nerve conduction study ("NCS") that Peter Grant, M.D. ("Dr. Grant") performed in 2008, (4) an EMG and NCS of all four extremities that Michael English, M.D., performed in August 2015, which incorporated Dr. Grant's 2008 and 2012 findings, (5) Plaintiff's consultation with a surgeon, (6) records from other providers at his clinic, and (7) a clinical note from Plaintiff's

optometrist, who determined that Plaintiff had "'oscillopsia[, a condition] usually caused from a neurologic change.'"[3] (*See* Tr. 735, 740-42, 1043, 1059-60, 1123, 1126, 1140-41, 1154-55, 1159-61.) Dr. Carlini also examined Plaintiff within weeks of her alleged disability onset date. All of these facts are significant because the ALJ assigned "great weight" to the opinion of the non-examining state agency medical consultant, Neal Berner, M.D. ("Dr. Berner"), even though Dr. Berner never treated Plaintiff, does not specialize in neurology (like Dr. Carlini), and issued his opinion two years before Plaintiff's established disability onset date without the benefit of several years of medical evidence. (*See* Tr. 28, 103.)

Furthermore, as the ALJ noted, over a year before the alleged disability onset date, a provider stated that Plaintiff's fibromyalgia was "magnified by [her] mood disorder" (Tr. 414), and Dr. Grant stated that Plaintiff exhibited "overdramatized pain behavior" during an EMG and NCS.[4] (Tr. 311.) The ALJ's reliance on these dated, isolated reports was misplaced because Dr. Carlini relied on objective test results in formulating his opinions, diagnosed Plaintiff with "progressive" polyneuropathy, and identified symptoms that suggested "significant progression" of her polyneuropathy, including "increased gait imbalance to the point of having had several falls" and a loss of "ankle reflexes." (Tr. 742, 1121-23; *see also* Tr. 1125, Dr. Carlini noted that Plaintiff's recent EMG and NCS "demonstrated a mixed axonal-demyelinating sensorimotor polyneuropathy," and that Plaintiff's recent MRI "demonstrated that there is multilevel spondylosis with particularly marked central canal stenosis at C6-7"; Tr. 1059, Plaintiff's exam

---

[3] Oscillopsia is "an illusion of an unstable visual world" associated with "poor visual acuity," and is a "disabling and distressing condition reported by numerous patients with neurological disorders." *McNeil v. Comm'r of Soc. Sec. Admin.*, No. 3:11-cv-01144-ST, 2012 WL 3756318, at *2 n.5 (D. Or. Aug. 28, 2012); *cf.* Tr. 779, 801 (Plaintiff reported that she gets dizzy because her "eyes bounce" and she feels like her "brain is disconnected inside [her] skull," and stated that it feels like "'everything [is] jumping constantly' irrespective of [her] position").

[4] "Medical opinions that predate the alleged onset of disability are of limited relevance." *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1165 (9th Cir. 2008).

was "notable for signs of peripheral neuropathy" and an "axial tremor"; Tr. 1081-82, noting that

an MRI revealed that Plaintiff has "severe spinal canal stenosis").

In discounting Dr. Carlini's opinion, the ALJ also noted that it was not clear why Plaintiff

"could not walk a block or stand for long," as Plaintiff's walker was not a "medical necessity"

and Dr. Carlini noted that Plaintiff "had motor power in all four limbs without any reports of

atrophy." (Tr. 27.) The record, however, demonstrates that on June 23, 2015, Plaintiff's treating

physician diagnosed her with "[a]bnormality of gait and mobility," and "[p]lace[d] [a]n order for

a wheeled walker with chair." (Tr. 1089.) The record also reveals that Plaintiff lost the reflexes

in her ankles and suffers from oscillopsia, both of which would impact her ability to stand and

walk.

Finally, the ALJ discounted Dr. Carlini's opinion because he did not report "any ill

effect" from Plaintiff's medications and described Plaintiff's tremor as "low amplitude," and

because Plaintiff "had not followed up with a pain specialist," which, according to the ALJ,

"suggest[ed]" that Plaintiff's "medication was helping to manage her pain and neuropathy."

(Tr. 27.) Contrary to the ALJ's finding and consistent with Dr. Carlini's medical source

statement, Dr. Carlini did, in fact, suggest that Plaintiff's medication causes dizziness. (*See*

Tr. 739, 1121-22, noting that Dr. Carlini recommended that Plaintiff stop taking gabapentin for a

period of time to see if it would help resolve her dizziness and that Plaintiff did so, but it did not

help.)

As to Plaintiff's referral to pain management, the record reveals that (1) on January 13,

2017, an orthopedic surgeon examined Plaintiff, reviewed Plaintiff's imaging, and determined

that Plaintiff was a "better candidate for comprehensive pain management" than surgery; and (2)

on May 30, 2017, and in the most recent treatment note on file, Dr. Carlini noted that Plaintiff

had not "obtain[ed] a consultation with the local chronic pain specialist[.]" (Tr. 1083.) It is not clear if Plaintiff obtained a consultation with a chronic pain specialist after May 30, 2017 (i.e., less than three months before her established onset date), but it is clear that a surgeon believed that Plaintiff's exam and imaging warranted a referral to a pain specialist, Plaintiff reported that she had "not noticed any benefit" from her medication for neuropathic pain as of May 30, 2017, and Plaintiff at times had "issues with her insurance." (Tr. 668, 1144, 1159.) It is also clear that although Dr. Carlini referred to Plaintiff's tremor as a "low amplitude . . . action/sustentation tremor of both upper extremities," he found that it would cause manipulative limitations. (*See* Tr. 1140, 1168.) However, the ALJ formulated an RFC that accounted for no manipulative limitations, even though the ALJ acknowledged that Plaintiff exhibited "tremors in both hands on exam" and that Plaintiff's tremor would have at least a minimal impact on her ability to perform basic work activities. (*See* Tr. 19, "The claimant was evaluated by a neurologist . . . and had tremors in both hands on exam. . . . The undersigned finds there is no objective medical evidence this impairment more than minimally effects [sic] the claimant's ability to perform basic work activities.").

For all of these reasons, the Court concludes that the ALJ failed to provide specific and legitimate reasons, supported by substantial evidence in the record, for discounting Dr. Carlini's opinion.

### 2.    Dr. Lake

Dr. Lake examined Plaintiff on March 3, 2015. (Tr. 747-52.) Dr. Lake conducted a clinical interview, reviewed some of Plaintiff's medical records, and administered tests. (Tr. 747-51.) Dr. Lake noted, among other things, that Plaintiff was "very tearful and dysphoric during the interview," Plaintiff used a walker and needed several breaks to "walk from the reception area to the office, which was about 50 feet away," Plaintiff's son has to help her bathe at times, and

PAGE 11 – OPINION AND ORDER

Plaintiff exhibited a tremor in her hands and "difficulty with mobility and walking." (Tr. 747-49.) Dr. Lake diagnosed Plaintiff with "persistent depressive disorder, moderate severity with melancholic features." (Tr. 751.) In terms of work-related activities, Dr. Lake opined that Plaintiff could perform simple tasks but may have difficulty with complex tasks, Plaintiff is "unable to mentally perform work activities secondary to her focus on her physical issues," Plaintiff may require additional instruction to "completely understand [a] task," Plaintiff's ability to maintain regular attendance may be "interrupt[ed] by her depression," Plaintiff's chronic depression would "affect[] her ability to focus and function, which would interrupt her work week," and Plaintiff is "not able to deal with the usual stress encountered in the workplace." (Tr. 751-52.) The ALJ assigned only "partial weight" to Dr. Lake's opinion (Tr. 28), but failed to provide specific and legitimate reasons, supported by substantial evidence in the record, for doing so.

As an initial matter, the ALJ discounted Dr. Lake's opinion because she "did not have the opportunity to review the longitud[in]al record," which, according to the ALJ, showed that Plaintiff "presented to most medical appointments without significant mental health findings." (Tr. 28.) Contrary to the ALJ's finding, Plaintiff often presented to medical appointments (including Dr. Lake's consultative exam in early March 2015) with significant mental health findings, such as frequent crying spells. (*Compare* Tr. 26-27, the ALJ found that there were "few reports of tearfulness in the record . . . compared to the many normal mental status exams," and that Plaintiff's "time off task can be accommodated by normal [work] breaks," *with* Tr. 56, 416, indicating that Plaintiff reported that she has "emotional break downs and cr[ies]" on a daily basis and "cries herself to sleep every night"; Tr. 413, Plaintiff was "tearful" during her mental status examination; Tr. 668-69, Plaintiff was "off Cymbalta due to insurance issues," "[t]earful

with exam," and "[t]earful and having pain"; Tr. 660-61, Plaintiff "get[s] tearful" and Plaintiff

was "[t]earful a bit with exam"; Tr. 688-89, Plaintiff was "tearful during [her] exam" and

"[p]ositive for dysphoric mood and decreased concentration"; Tr. 809-10, Plaintiff was "tearful"

during her exam; Tr. 798-99, Plaintiff was "very tearful with exam," "tearful and crying [during

her] visit," and "[p]ositive for dysphoric mood and decreased concentration"; Tr. 794, Plaintiff's

depression was "not well controlled" and Plaintiff was "very tearful during [her] office visit"; Tr.

750-51, Plaintiff was "very tearful and dysphoric" and "tearful throughout [her] interview"; Tr.

1107, Plaintiff is "emotionally labile with periods of tearfulness").

The ALJ committed harmful error by failing to account for Plaintiff's crying spells in

formulating her RFC, as nothing in the record supports the ALJ's finding that Plaintiff's crying

spells could simply be accommodated by normal work breaks. *See Altorfer v. Colvin*, No. 3:14-

cv-01933-HZ, 2015 WL 9255544, at *14 (D. Or. Dec. 18, 2015) (holding that the ALJ's RFC

assessment was defective because it failed to account for the claimant's persistent "crying

spells"); *see also Aileen W. v. Comm'r of Soc. Sec.*, No. 19-6075, 2020 WL 3482011, at *2

(W.D. Wash. June 26, 2020) (referring to "tearful behavior" as an "abnormal" mental status

finding).

The ALJ also discounted Dr. Lake's opinion because Plaintiff engaged in only "minimal

mental health treatment" and there was "no evidence of psychiatric care." (Tr. 28.) The ALJ

erred in doing so. According to the Ninth Circuit, "it is common knowledge that depression is

one of the most underreported illnesses in the country because those afflicted often do not

recognize that their condition reflects a potentially serious mental illness," and "'it is a

questionable practice to chastise one with a mental impairment for the exercise of poor judgment

in seeking rehabilitation.'" *Nguyen*, 100 F.3d at 1465 (quoting *Blankenship v. Bowen*, 874 F.2d

1116, 1124 (6th Cir. 1989)). Thus, the fact that Plaintiff "may be one of millions of people who did not seek treatment for a mental disorder until late in the day is not a substantial basis on which to conclude that [Dr. Lake's] assessment of [Plaintiff's mental] condition is inaccurate." *Id.* That is especially true when, as here, Plaintiff pursued some mental health treatment and experienced insurance issues that impacted her ability to get treatment. (*See* Tr. 414, 567, 668-69).

Additionally, the ALJ discounted Dr. Lake's opinion regarding Plaintiff's mental condition because Plaintiff "exhibited significant physical difficulties that she did not have a couple months earlier." (Tr. 28.) Presumably, the ALJ was referring to the fact that Plaintiff "presented to this exam . . . with a walker and needing to take several breaks to walk fifty feet." (Tr. 27.) The record demonstrates that Plaintiff complained about balance issues, falls, and dizziness before Dr. Lake's March 2015 exam. (*See* Tr. 623-24, on August 6, 2014, Plaintiff had "balance issues with falls" and complained about a "sensation of room spinning, poor balance, . . . loss of coordination, [and] falling down"; *but cf.* Tr. 25, the ALJ stated that Plaintiff only "told her physical therapist [in March 2015 that] she fell over 100 times in the past year" after "she was initially denied benefits," and "made no mention of such voluminous falls to her neurologist [in January 2015]"). As discussed, the record also shows that Plaintiff's provider ordered her a walker due to her instability and Plaintiff suffers from oscillopsia and progressive neuropathy. Thus, the ALJ erred in discounting Dr. Lake's opinion based on Plaintiff's physical presentation.

The ALJ also discounted Dr. Lake's opinion on the ground that it "appeared largely based on the claimant's presentation and self-reported symptoms, not objective findings." (Tr. 28.) This was error, as Dr. Lake conducted a clinical interview, performed a mental status

examination, reviewed medical records, observed Plaintiff, and administered several tests. *See, e.g.*, *Shelley V. v. Saul*, No. 6:18-cv-01760-SB, 2020 WL 1131489, at *10 (D. Or. Mar. 9, 2020) (explaining that clinical interviews and mental status examinations are "objective measures and cannot be discounted as a 'self-report'" and that "the rule allowing an ALJ to reject opinions based on self-reports does not apply in the same manner to opinions regarding mental illness" because that is "the nature of psychiatry" (quoting *Buck v. Berryhill*, 869 F.3d 1040, 1045 (9th Cir. 2017))).

Finally, the ALJ discounted Dr. Lake's opinion because her "mental status exam findings were fairly normal with some mild findings, but the claimant was overall cognitively and social intact, and she persisted through the tasks and appointment." (Tr. 28.) Dr. Lake, however, made several abnormal observations, including that Plaintiff was "often tearful throughout the interview," Plaintiff's "affect was congruent with her stated mood" of "sad," Plaintiff could only repeat up to two out of three objects after a five-minute delay, Plaintiff "successfully" counted "backwards from 20 by 3s" but did so in a "slow and deliberate manner," Plaintiff was "very tearful and dysphoric during the [clinical] interview," Plaintiff exhibited "some mild concentration issues," and Plaintiff's "life situation" was "only exacerbating her depression." (Tr. 747-52.) Given these facts and the harmful errors described above, the Court cannot conclude that it was reasonable for the ALJ to discount Dr. Lake's opinion as inconsistent with her own findings.

For these reasons, the ALJ failed to provide specific and legitimate reasons, supported by substantial evidence in the record, for discounting Dr. Lake's opinion.

///

///

II.     **PLAINTIFF'S SYMPTOM TESTIMONY**

     A.     **Applicable Law**

The Ninth Circuit has "established a two-step analysis for determining the extent to which a claimant's symptom testimony must be credited[.]" *Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Garrison*, 759 F.3d at 1014 (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007)). Second, "'[i]f the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if she gives specific, clear and convincing reasons for the rejection.'" *Ghanim*, 763 F.3d at 1163 (quoting *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009)).

Clear and convincing reasons for rejecting a claimant's testimony "include conflicting medical evidence, effective medical treatment, medical noncompliance, inconsistencies in the claimant's testimony or between her testimony and her conduct, daily activities inconsistent with the alleged symptoms, and testimony from physicians and third parties about the nature, severity and effect of the symptoms complained of." *Bowers v. Astrue*, No. 11-cv-583-SI, 2012 WL 2401642, at *9 (D. Or. June 25, 2012) (citing *Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008), *Lingenfelter*, 504 F.3d at 1040, and *Light v. Social Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997)).

     B.     **Analysis**

There is no evidence of malingering here and the ALJ determined that Plaintiff provided objective medical evidence of underlying impairments which might reasonably produce the symptoms alleged. (*See* Tr. 23, the ALJ found that Plaintiff's "medically determinable

impairments could reasonably be expected to cause some of the alleged symptoms"). The ALJ was therefore required to provide clear and convincing reasons for discrediting Plaintiff's testimony. *See Ghanim*, 763 F.3d at 1163. The ALJ failed to meet that standard here.

The Commissioner argues that the ALJ appropriately discounted Plaintiff's testimony on the ground that (1) it was inconsistent with the objective evidence, (2) it was inconsistent with Plaintiff's treatment history, such as her "minimal and conservative" mental health treatment, and (3) Plaintiff worked with the impairments that she claims are disabling. (Def.'s Br. at 4-8.) The Court disagrees.

The record demonstrates that before the alleged onset of disability, Plaintiff's impairments caused her to miss work at a rate that exceeds the customary tolerances for absences. (*See* Tr. 55, 61, Plaintiff testified about missing at least ten days a month and the VE testified about the customary tolerances for absences). Further, as discussed above, the objective evidence is not inconsistent with Plaintiff's testimony. On the contrary, the objective evidence discussed herein supports Plaintiff's testimony. (*See, e.g.*, Tr. 331, 794, Plaintiff exhibited "18/18 fibro tender points" and that Plaintiff's provider stated that her fibromyalgia was "not well controlled"); cf. *Revels v. Berryhill*, 874 F.3d 648, 662-63 (9th Cir. 2017) (explaining that "a doctor need only find eleven out of eighteen tender points to diagnose" fibromyalgia, that "tender-point examinations themselves constitute 'objective medical evidence' of fibromyalgia," and that "there are no laboratory tests to confirm fibromyalgia"). As to Plaintiff's mental health treatment, the ALJ erred by failing to consider that Plaintiff's mental health condition and insurances issues may have impacted her treatment decisions.

In sum, substantial evidence does not support the ALJ's decision to discount Plaintiff's testimony.

### III.    REMEDY

#### A.    Applicable Law

"Generally when a court of appeals reverses an administrative determination, 'the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'" *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004) (citing *INS v. Ventura*, 537 U.S. 12, 16 (2002)). In a number of cases, however, the Ninth Circuit has "stated or implied that it would be an abuse of discretion for a district court not to remand for an award of benefits when [the credit-as-true standard is] met." *Garrison*, 759 F.3d at 1021 (citing *Lingenfelter*, 504 F.3d at 1041).

The credit-as-true standard is met if the following conditions are satisfied: "(1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand." *Garrison*, 759 F.3d at 1020. Even when the credit-as-true standard is met, the district court retains the "flexibility to remand for further proceedings when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act." *Id.* at 1021.

#### B.    Analysis

The Court finds that the credit-as-true standard is satisfied here and that remand for an award of benefits is warranted.

First, the Court finds that the record has been fully developed. It includes several years of treatment notes, testimony from Plaintiff about her symptoms and limitations, and opinions from a treating specialist, Dr. Carlini, and examining psychologist, Dr. Lake. The ALJ asked the VE

hypothetical questions that addressed whether a hypothetical worker with Plaintiff's limitations could sustain gainful employment, and the VE testified that Plaintiff's limitations would preclude work. (*See* Tr. 61, the ALJ asked the VE about the customary tolerances for absences in the workplace and the VE responded that a worker could not sustain gainful employment if they missed "more than one day per month on an ongoing basis, outside of accrued leave"; *cf.* Tr. 1169, Dr. Carlini opined that Plaintiff's medical problems would cause her to miss more than four days of work per month).

As to further proceedings, the Commissioner argues that this is not the "rare" case that warrants a remand for benefits because the objective evidence, Plaintiff's treatment history, and the non-examining state agency consultants' opinions create "serious doubt" about whether Plaintiff is, in fact, disabled. (Def.'s Br. at 13.) The Court is not persuaded. The objective evidence, including the objective evidence that the ALJ overlooked, supports Drs. Carlini's and Lake's opinions that Plaintiff's impairments would prevent her from working and maintaining regular attendance, as was the case before the onset date. (*See* Tr. 55, showing that Plaintiff testified that she missed at least ten days per month before she stopped working). The non-examining state agency consultants also issued their opinions several years before Plaintiff's established onset date and did not have the benefit of examining or treating Plaintiff or reviewing several years' worth of medical records regarding Plaintiff's progressive condition. Additionally, Plaintiff's treatment history is consistent with her mental health and insurance issues.

Furthermore, in this Court's view, Ninth Circuit precedent and the objectives of the credit-as-true standard foreclose any suggestion that a remand for the purpose of allowing the ALJ to have a mulligan qualifies as a remand for a "useful purpose": "[O]ur precedent and the objectives of the credit-as-true rule foreclose the argument that a remand for the purpose of

allowing the ALJ to have a mulligan qualifies as a remand for a 'useful purpose' under the first part of credit-as-true analysis." *Garrison*, 759 F.3d at 1021; *see also Benecke*, 379 F.3d at 595 ("Allowing the Commissioner to decide the issue again would create an unfair 'heads we win; tails, let's play again' system of disability benefits adjudication."); *Moisa v. Barnhart*, 367 F.3d 882, 887 (9th Cir. 2004) ("The Commissioner, having lost this appeal, should not have another opportunity to show that [the claimant] is not credible any more than [the claimant], had he lost, should have an opportunity for remand and further proceedings to establish his credibility."). Accordingly, the Court concludes that Plaintiff satisfies the first part of the credit-as-true analysis.

Second, as discussed above, the ALJ failed to provide legally sufficient reasons for rejecting Plaintiff's testimony and Drs. Carlini's and Lake's opinions. Accordingly, Plaintiff satisfies the second part of the credit-as-true analysis.

Third, if the improperly discredited evidence were credited as true, the ALJ would be required to find Plaintiff disabled because her impairments would cause her to exceed the customary tolerance for absences.

For these reasons, and because the Court does not have serious doubt about whether Plaintiff is disabled, the Court exercises its discretion to remand this case for an award of benefits.

///

///

///

///

///

## CONCLUSION

For the reasons stated, the Court REVERSES the Commissioner's decision and

REMANDS this case for an award of benefits.

**IT IS SO ORDERED.**

DATED this 14th day of September, 2020.

_____
HON. STACIE F. BECKERMAN
United States Magistrate Judge